J-S35045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO K.N. AND X.H. | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.L.H., Biological Mother | : | No. 3654 EDA 2015 |

Appeal from the Decree November 6, 2015
in the Court of Common Pleas of Lehigh County,
Orphans' Court at No(s): A2014-0058 & A2014-0059

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E. and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED APRIL 29, 2016**

N.L.H. ("Mother") appeals from the Decrees[1] granting the Petitions filed by the Lehigh County Office of Children and Youth Services ("CYS") to involuntarily terminate her parental rights to her minor male children, K.N.,

---

[1] Mother filed one appeal from two separate Decrees, each of which terminated her parental rights as to one child.  Although filing one appeal from separate orders is generally discouraged, Mother's arguments regarding each child are identical and arise from the same set of facts.  ***See Baker v. Baker***, 624 A.2d 655, 656 (Pa. Super. 1993) (considering an appeal from separate orders where appellant's arguments were identical and stemmed from the same factual precedent).  Additionally, the trial court issued one Opinion to address both Decrees.  ***See Dong Yuan Chen v. Saidi***, 100 A.3d 587, 589 n.1 (Pa. Super. 2014) (stating that an appeal from two separate orders was not fatal where the trial court addressed the issues pertaining to both orders).  Therefore, under these circumstances, this procedural error is not fatal to Mother's appeal.

born in May 2005, and X.H., born in November 2007 (collectively, "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[2, 3]

In its Opinion, the trial court aptly summarized the factual and procedural history of this case, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 11/6/12, at 2-13.

Relevantly, CYS received referrals regarding K.N.'s truancy, as well as concerns about Children's hygiene, malnourishment, and emotional problems. After CYS filed Dependency Petitions, Mother placed Children with a relative. The Petitions were subsequently withdrawn. The relative subsequently became unable to care for Children, and Mother voluntarily placed Children in foster care in December 2012.

Children were adjudicated dependent on January 8, 2013. After a hearing on January 29, 2013, the trial court set reunification goals. Mother did not comply with most of the court-ordered services, and she did not cooperate regarding either Children's or her own mental health services.

Since the original foster care placement, Children have been moved several times, including multiple stays in a psychiatric hospital, therapeutic

---

[2] CYS also filed Petitions to involuntarily terminate Mother's parental rights to her twin daughters, born in August 2012. The twins were adjudicated dependent on September 4, 2013. On February 3, 2015, CYS filed withdrawals of the Petitions regarding the twin daughters. Ultimately, a Dependency Division Order was entered on September 22, 2015, authorizing the return of the twins to Mother, and the trial court permitted CYS to withdraw the Petitions regarding the twin daughters.

[3] The trial court also involuntarily terminated the parental rights of J.N., the father of K.N., and P.J. a/k/a J.P., the father of X.H.

residential treatment placements, therapeutic foster home placements, and emergency room visits. Mother did not consistently visit with Children during many of these placements, and she did not visit Children at all in more than a year prior to the final permanency review hearing.

On September 24, 2014, CYS filed Involuntary Termination of Parental Rights ("ITPR") Petitions against Mother under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). After a hearing, the trial court terminated Mother's parental rights as to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother filed a timely Notice of Appeal and a Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement.

On appeal, Mother raises the following question for our review:

> Whether the trial court abused its discretion and committed an error of law by terminating Mother's parental rights in finding that termination best meets the need[s] and welfare of [] Children[,] where the [trial] court failed to discern the effect that severance of the bond would have on [] Children[,] and where there is no permanent placement for [] Children[?]

Mother's Brief at 7.

We review an appeal from the termination of parental rights in accordance with the following standard:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

- 3 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Termination of parental rights is controlled by section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden is upon the petitioner "to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted). Further, the "trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If the competent evidence supports the trial court's findings, "we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for the involuntary termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, Mother only challenges the trial court's determination as to Section 2511(b), which states the following:

**§ 2511. Grounds for involuntary termination.**

* * *

- 4 -

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Mother argues that the trial court abused its discretion in granting the ITPR Petitions without properly considering the effect of severing the bond between Mother and Children. Mother's Brief at 11, 12-14. Mother claims that the trial court failed to conduct a proper "best interests" analysis under Section 2511(b). *Id.* at 13. Further, Mother asserts that the trial court abused its discretion in granting the ITPR Petitions despite a lack of permanent placement for Children. *Id.* at 14-15. Mother argues that even if her bond with Children is maladaptive, it is the only bond they have, and that bond should not be severed without a permanent placement. *Id.*

The trial court set forth the relevant law regarding Section 2511(b), and determined that it was in Children's best interest to terminate Mother's parental rights. *See* Trial Court Opinion, 11/6/15, at 19-21. Upon our review, the trial court appropriately applied Section 2511(b) to this case, and we adopt its Opinion for the purpose of this appeal. *See id.*

Accordingly, the trial court did not err in granting the ITPR Petitions.

Decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/29/2016

S35045-16

CLERK OF ORPHANS
COURT DIVISION
LEHIGH COUNTY

2015 NOV -9 P 12: 08

COURTHOUSE
ALLENTOWN, PA.

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In re: Involuntary Termination of Parental Rights to :

|  |  |  |
|---|---|---|
| K.N. | : | No.: A2014-0058 |
| and | : | |
| X.H., | : | No.: A2014-0059 |
| | : | |
| Minors | : | Assigned Judge: |
| | : |     Douglas G. Reichley, J. |

* * * * * * * * * * * *

APPEARANCES:

Glenn R. Smith, Esquire
    on behalf of Lehigh County Office of Children & Youth Services

Catherine L. Kollet, Esquire
    on behalf of N.L.H., Mother

Susan G. Maurer, Esquire
    on behalf of Fathers

Joann Sallit Hull, Esquire
    on behalf of the minor children

* * * * * * * * * * * *

**DOUGLAS G. REICHLEY, J.**

## OPINION

On September 24, 2014, LCOCYS filed petitions to involuntarily terminate Mother's parental rights to four of her children, including the two above-captioned minors. The hearing on the involuntary petitions pertaining to the above-captioned minors was held on July 17, 2015, before the undersigned.[1]

FINDINGS OF FACT

1. K.N. is a male child born on May 30, 2005; he is 10 years old.

2. X.H. is a male child born on November 12, 2007; he is 7 years old.

3. The mother of K.N. and X.H. is N.L.H. ("Mother").

4. K.N.'s father is J.N., and X.H.'s father is P.J. a/k/a J.P. The parental rights of the father of each of the minors were involuntarily terminated pursuant to Final Decrees entered this date.

---

[1] Involuntary termination hearings were originally scheduled for March 5 and 6, 2015, for all four minor children. Neither Mother nor her counsel appeared on March 5 due to inclement weather, and counsel for the fathers presented issues warranting continuance of the involuntary termination hearings regarding the fathers. Accordingly, the involuntary termination hearings were rescheduled to the next available date before the undersigned, July 17, 2015.

Since the filing of the involuntary termination petitions regarding the four children, LCOCYS filed withdrawals of its petitions regarding two of the children on February 3, 2015. These two children are three-year-old twin girls. The twin girls entered foster care within a few days of their birth and remained in the same foster home continuously. For the past several months, a different caseworker was involved with the twin girls than the caseworker who was assigned to work with the boys in the above-captioned matters. By Order entered February 11, 2015, these withdrawals were taken under advisement by the Court and remain under advisement per Order entered March 16, 2015.

We note that counsel for LCOCYS has not filed an update in the Orphans' Court as directed in the March 16, 2015, Order. At the July 17, 2015 involuntary termination hearing, counsel for LCOCYS verbally reported to the undersigned that in the interim, upon the recommendation of counsel for LCOCYS and the caseworker assigned to the twin girls at the time, the Dependency Division decided the twin girls should be returned to Mother, with said transfer of care to occur on July 20, 2015. Apparently a Dependency Division Order was entered on September 22, 2015, authorizing the return of the twin girls to their mother. In light of that order, this Court will defer to the Dependency Division and will permit the agency to withdraw the §2511 petitions filed regarding the twin girls, which to date had remained under advisement by this Court.

5. Mother has several other children: K.N. and X.H. are aware of the existence of several of their siblings.

6. As of the July 17, 2015, termination hearing, Lehigh County Office of Children and Youth ("LCOCYS" or "the agency") caseworker Sarah Merkel was assigned to the cases of K.N. and X.H.[2] As custodian of K.N.'s and X.H.'s files, Ms. Merkel was familiar with the family's case history and Mother's involvement with the agency since 1995, mostly for children other than K.N. and X.H. The agency's involvement included approximately a dozen referrals based on a host of concerns such as truancy, unstable housing, inappropriate living conditions, inadequate housekeeping, insufficient food, parenting issues, inappropriate caretakers, the children's behavioral problems, Mother's failure to comply with her children's mental health needs, Mother's failure to comply with her own mental health needs including medication compliance, and Mother's failure to comply with in-home services.

7. LCOCYS referrals specifically involving K.N. and X.H. began in 2011 regarding truancy of K.N. as well as concerns that both boys were underweight, malnourished, and had very poor hygiene. Additionally, both boys had significant emotional issues. At that time, Mother was not following LCOCYS recommendations that she should consistently attend her own mental health appointments and that she should take K.N. and X.H. for mental health evaluations. She was not permitting the agency or recommended in-home services into her home.

---

[2] This assignment occurred in December of 2014.

8. On January 26, 2012, Mother agreed to a safety plan to prevent Mother's oldest child, T▓▓▓ from having contact with any of the other children until he completed sexual offender treatment because T▓▓▓ had been found to be indicated as an alleged perpetrator of inappropriate sexual contact with his little sister, G.H., who also lived in the home at that time.

9. Mother did not comply with the safety plan but continued to allow contact between T▓▓▓ and her other children.

10. As a result of Mother's noncompliance with services, on May 25, 2012, the agency filed dependency petitions and a petition to compel entry into Mother's home. On June 1, 2012, the Court entered orders granting the petitions. The agency required assistance of law enforcement several times in June to enforce the June 1, 2012, order that permitted the agency to gain entry into Mother's home.

11. Mother subsequently placed K.N. and X.H. with a relative in August of 2012. The agency then withdrew the May 25, 2012, involuntary petitions regarding K.N. and X.H. in September of 2012.

12. In November of 2012, the relative ended the placement because of her own illness and her inability to handle the boys' serious mental health issues.

13. The boys could not return home due to the lack of any in-home service provider to work with Mother at the time. Mother had been unsuccessfully discharged from in-home services several times due to her failure to comply or her refusal to allow the providers into the home.

14. On December 4, 2012, Mother voluntarily placed K.N. and X.H. in foster care.

15. K.N. and X.H. have been in placement in excess of 30 months. Neither has ever returned to Mother's household.

16. When the two boys were placed in LCOCYS custody in 2012 pursuant to Mother's voluntary placement, K.N.'s teeth were rotted out at the age of 7 or 8. X.H., then age 5, was developmentally delayed. Both boys had significant mental health issues.

17. K.N. and X.H. were adjudicated dependent on January 8, 2013. Mother stipulated she was unable to provide for their needs at that time. *See* P-1, Order adopting *Master's Recommendation for Adjudication – Child Dependent* filed Feb. 14, 2013.

18. Following a dispositional hearing on January 29, 2013, the Court set the following reunification goals for Mother regarding K.N. and X.H.:

    1) Receive mental health evaluations and follow through with all recommendations;
    2) Obtain and maintain safe, stable and sanitary housing;
    3) Obtain and maintain verifiable income;
    4) Attend visitation with the children as directed by LCOCYS;
    5) Comply and cooperate with her children's medical, developmental, and mental health treatment services;
    6) Comply with any in-home services provided by LCOCYS for purposes of reunification, parenting education and monitoring;
    7) Contact and cooperate with LCOCYS; allow the LCOCYS caseworkers into the home, comply with any services recommended and maintain contact with the agency;
    8) Notify LCOCYS of any changes regarding address and phone.

    *See* P-1, Order adopting *Master's Recommendation for Disposition* filed February 20, 2013.

19. On June 17, 2013, the agency received another referral identifying new acts of sexual abuse by Mother's oldest son, T███████, against his little sister, G.H. On June 19, 2013, Mother

5

agreed to another safety plan providing that Mother would not permit T█████ to have *any* contact with her children.[3]

20. Although Mother signed and agreed to the terms of the second safety plan, she did not comply with the plan. Later in June, G.H. disclosed that T█████ was staying in Mother's home. On June 22, 2013, LCOCYS along with members of the Allentown Police Department went to Mother's home and found T█████ there. He was arrested at that time for possession of drug paraphernalia and marijuana.[4]

21. The June 19, 2013 safety plan was included in the court-ordered compliance goals required of Mother at the July 30, 2013 Juvenile Dependency Permanency Review Hearing.

22. As reflected by the Dependency Division Orders in Exhibit P-1, between January and August of 2013, Mother was unable to cope with the responsibilities of finding work, obtaining housing, and complying with visitation and recommended services. She was overwhelmed by simple parenting and continued to be unable to meet the needs of K.N. and X.H.

23. During the more than 30 months of the Juvenile Dependency proceedings regarding K.N. and X.H., Mother did not consistently comply with most of the court-ordered services. She did obtain subsidized public housing, which she has maintained successfully for two years.[5]

---

[3]  Mother also agreed pursuant to the safety plan not to permit her paramour, E████C█████, to have any unsupervised contact with her children.
[4]  Due to Mother's failure to adhere to the safety plan, G.H. was removed from Mother's home and placed with a step-grandparent.
[5]  Somehow Mother succeeded in retaining her public housing apartment despite T█████'s arrest on June 22, 2013 for drugs in Mother's home. This is especially surprising in light of the so-called "one strike" zero tolerance policy against drugs adopted by HUD in the 1990's. Mother's current 2-bedroom apartment is not large enough for either of the boys to live in her household, but if either or both boys were approved to return to Mother's care, Mother would be able to apply for a larger apartment.

24. Mother never successfully completed in-home services with any of the several service providers that LCOCYS provided to assist her to improve her parenting and to reunify with her children.

25. Mother did not consistently attend her own mental health appointments or follow through with recommendations. At the time of the termination hearing, she was not attending any mental health appointments. Additionally, Mother has not completed a non-offending parent evaluation recommended by LCOCYS.

26. Mother did not stay in touch with K.N.'s and X.H.'s caseworker. She failed to show for scheduled appointments. She was frequently unreachable by phone.

27. Mother's failure to maintain contact with the boys' caseworker impeded imminently necessary mental health treatment. LCOCYS had to obtain emergency court orders at three different points to provide the consent for necessary treatment for X.H. or K.N. because Mother failed to respond or return phone calls. *See* P-1, *Orders Providing Authorization to Consent to Medical Testing, Treatment and Procedures* signed April 23, 2014, and March 27, 2015, for X.H. and signed March 20, 2015 for K.N.

28. Mother's failure to return calls made it more difficult to enroll X.H. in a partial hospitalization school based program and impeded K.N.'s ability to be hospitalized at critical times.

29. Mother did not comply with or cooperate with the boys' developmental, medical and mental health services. She has been only marginally involved in their care.

30. K.N. is diagnosed with Reactive Attachment Disorder, Impulse Control Disorder, and Post-traumatic Stress Disorder. Among other things, he has a history of urinating and defecating on himself and has attempted to abscond from multiple settings. At times, he shuts down

7

completely and appears to become nearly catatonic when faced with a new, uncomfortable situation.

31. X.H. is diagnosed with Reactive Attachment Disorder, Post-traumatic Stress Disorder (chronic), Impulse Control Disorder, Interpersonal Problems, and Oppositional Defiant Disorder. In kindergarten, he was suspended from school for 8 days between September and October due to aggressive behavior. X.H. hears voices that tell him to do bad things, hurt other people or himself, or be aggressive.[6] He requires several prescription medications for his mental health needs.

32. Both boys have a history of severe physical outbursts, sexualized behaviors, aggressive behaviors, destruction of property, and at times being a danger to themselves and to others to the point of having to be restrained or placed in isolation.

33. Since their original placement in foster care, each of the boys has been moved numerous times, including multiple stays in psychiatric hospital, therapeutic residential treatment placements, therapeutic foster home placements, and emergency room visits. At times, the minor had to be held in restraints or was placed in isolation for several days waiting for a more appropriate placement given his extreme mental health issues.[7]

---

[6] Evidence in the record indicates these auditory hallucinations were documented at age 6, although there was not any evidence presented on how long the child had been hearing voices. It was made clear that the phenomenon was different from having an imaginary friend. X.H.'s auditory hallucinations are more prevalent when he is in a heightened state of agitation.

[7] K.N. was placed in-patient at the Horsham Clinic on December 15, 2012, following a brief stay in two separate foster homes. From the Horsham Clinic, he was transferred on February 26, 2013, to a trauma focused foster home. He was hospitalized at KidsPeace beginning on May 9, 2013, where he frequently had to be restrained due to his aggressiveness toward staff and other children. Thereafter, K.N. resided in two foster homes. He was moved to Warwick House, a therapeutic residential treatment facility from June 11, 2013, to May 15, 2104. From there he went to a therapeutic foster home. (His brother X.H. was added to that household on November 24, 2014.) In March of 2015, he was hospitalized for one week at the Lehigh Valley Hospital emergency room before being transferred to Rockford Center in Newark, Delaware. It is not clear at what point he returned to the therapeutic foster home. On May 11, 2015, he was moved to the Valley Youth House PATHS program. After just a few days there, he attempted to

8

34. Three Child Protective Services investigations were initiated against Mother based on disclosures made by the boys. Each referral was ultimately deemed unfounded because the boys could not be interviewed due to their extremely unstable mental health in the psychiatric hospital setting.

35. The boys have had a traumatic background due to prolonged inconsistent care and neglect by Mother, alleged sexual abuse, and possible physical abuse.

36. The boys' transfer to the PATHS program occurred because K.N. disclosed sexual acting out between himself and X.H. in the therapeutic foster home.

37. Additional concerns existed that K.N. may have inappropriately touched the 4-year-old grandchild of the foster parents in the therapeutic foster home.

38. As a result of a psycho-sexual evaluation in April of 2015, K.N. was recommended not to be placed in a foster home with children younger than nine years old.

39. X.H. continues to exhibit a lot of sexualized behavior, such as talking about putting his penis into different parts of people's bodies.

40. Both boys are recommended to have 24-hour supervision, seven days a week, at this time.

41. At times, the therapeutic recommendations have advised that there not be any contact between the child and Mother due to the boys' respective mental health instability.

---

abscond. He became extremely aggressive, and was hospitalized in restraints at the Lehigh Valley Hospital emergency room until he could be transferred to Devereux Hospital, where he currently remains awaiting placement in a therapeutic residential facility.

Since X.H. has been in the custody of LCOCYS, he has been placed in three foster homes and undergone two hospital stays at KidsPeace Hospital. X.H. was admitted to Warwick House on May 21, 2014, after his brother had already been discharged from the residential treatment facility. On November 24, 2014, he was discharged from Warwick House to the therapeutic foster home in which K.N. was placed. On May 11, 2015, like his brother, he was moved to the Valley Youth House PATHS residential program. Three days later, he attempted to abscond. Beginning on May 14, 2015, he was kept in the Lehigh Valley Hospital Emergency Room for six days. He is currently in the Western Psychiatric Hospital in Pittsburgh, where he awaits placement in a residential treatment facility.

42. During the timeframes that phone contact was allowed, Mother was only sporadically available[8] or, as occurred between December of 2014 (when supervised phone contact would have been permitted to begin) and May of 2015 (when the boys were both hospitalized), Mother failed to follow through with setting up phone contact.

43. Throughout their many placements, Mother did not visit with either K.N. or X.H. consistently. Mother has not visited her boys at the Emergency Room or at the hospital.[9]

44. It has been over a year since Mother visited either X.H. or K.N.

45. Presently, there are not any visits recommended due to each of the boys' severely unstable mental health status in their respective psychiatric hospitals.

46. According to the CASA assigned to the boys, Mother has not maintained any contact with K.N. since the beginning of the CASA's involvement in K.N.'s case in approximately January 5, 2015. Mother has not maintained contact with X.H. since at least June 30, 2014.[10]

47. Mother was inconsistent in her attendance at family therapy at Warwick House for K.H. and eventually stopped altogether. Mother never participated in X.H.'s family therapy at Warwick House.

48. In 2014 and 2015, Mother has not attended any meetings regarding X.H.'s school needs or his mental health needs. Mother did not attend I.E.P. meetings held regarding X.H.'s

---

[8] During each minor's stay at Warwick House, the facility kept track of Mother's availability. During K.N.'s treatment at Warwick House between June of 2013 and May of 2014, Mother was unavailable for 72% of calls made to her. During X.H.'s treatment at Warwick house between May and November of 2014, Mother was unreachable for 83% of his attempts to call her.

[9] Mother did have phone contact with a Western Psychiatric Hospital social worker regarding X.H.

[10] This CASA was appointed in X.H.'s case on June 30, 2014, long before her appointment in K.N.'s case on January 5, 2015.

schooling in 2014 and 2015 or CASSP (Child and Adolescent Service System Program) meeting in 2015. *See* G-1.

49. The testimony of Anthony Pennant[11] and Angela Ramautar, both of whom are former therapists of K.N., clearly established that the bond between K.N. and Mother is strained at best.

50. During his time at Warwick House, Mother's ambivalence and inconsistency to provide for K.N.'s basic needs hindered reunification efforts that were underway. K.N. would be highly dysregulated, or impaired in his physiological condition prior to scheduled visits with Mother but appeared relieved when sessions were cancelled. *See* F-9, *Letter from Jeffrey M. Friedman, Clinical Director of Warwick House, and Anthony Pennant, Primary Therapist, dated Jan. 24, 2014.*

51. K.N. began to make progress in his treatment at Warwick House during the 2013-14 time frame only after Mother completely stopped attending the scheduled monthly family therapy and was unreachable by phone. At some point during his stay at Warwick House, K.N. began refusing Mother's calls altogether, and was doing much better after Mother stopped visiting K.N. at Warwick House.

52. Similarly, after K.N. went to the therapeutic foster home in May of 2014, Mother again stopped visiting altogether. K.N.'s extreme behaviors stabilized and his mental health improved until his brother arrived in the home.

---

[11] Anthony Pennant was K.N.'s primary therapist at Warwick House starting in December of 2013. He also worked with X.H. when X.H. was at Warwick house.

53. Regarding Mother's bond with X.H., Mother has not spoken with or seen X.H. in over a year.

54. Until June of 2013, X.H. had some visits in Mother's home, but those visits stopped when Mother violated the safety plan and allowed her son T█████to have contact with her other children. X.H. has not visited the home since. During the time he was having visits in the home, he was struggling with the visits as well as having mental health issues.

55. From May of 2014 to November of 2014, Mother did not consistently visit X.H. at Warwick.

56. Mr. Pennant opined that another placement in a residential facility such as Warwick House could do wonders for X.H., but only if he would go to a pre-adoptive home afterward.

57. Mr. Pennant opined that the ongoing possibility of a biological parent being in and out of the lives of either minor will impede the minor's ability to move forward in life, and that termination of parental rights is necessary to help the boys overcome their diagnoses.

58. Presently, K.N. is a patient at Devereux Hospital near Philadelphia, and X.H. is a patient at Western Psychiatric Hospital in Pittsburgh. Both boys are awaiting placement in a residential treatment facility.

59. Both boys have a very great need for consistency, for care, and for supervision. Without it, they cannot move forward.

60. The current therapeutic recommendation is that K.N. and X.H. be placed separately due to their competing needs, although Mr. Pennant indicated that sibling contact is acceptable. *See* Ex. F-9.

61. Past attempts to place the boys together in foster care together resulted in each of them decompensating severely.

62. No adoptive resource has presently been identified for either of the boys.

63. The caseworker opined that termination of parental rights is nevertheless in the best interests of both children. Once the children are freed for adoption, the agency has more options for helping them obtain permanency through specific permanency recruitment.

64. The CASA is also in favor of termination of parental rights so each of the boys can achieve permanency in a loving home that will provide them with the consistent care that each of them needs.

CONCLUSIONS OF LAW

1. Petitioner established by clear and convincing evidence that Mother by her conduct continuing for a period of at least six months immediately preceding the filing of the petitions to terminate her rights evidenced a settled purpose to relinquish her parental claim to K.N. and X.H. and refused to or failed to perform parental duties.

2. Petitioner established by clear and convincing evidence that Mother's repeated and continued incapacity, neglect and refusal has caused K.N. and X.H. to be without essential parental care, control or subsistence necessary for their physical and mental well-being, and Mother cannot or will not remedy the conditions and causes of the incapacity, neglect and refusal in a reasonable period of time.

3. Petitioner established by clear and convincing evidence that K.N. and X.H. were removed from Mother's care by the court for a period in excess of six months, the conditions which led to the removal of the children continue to exist, Mother cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the

13

children within a reasonable period of time, and termination of the parental rights would best serve the needs and welfare of the children.

4. Petitioner established by clear and convincing evidence that K.N. and X.H. were removed from Mother's physical and legal custody by the court, more than twelve months have elapsed from the date of removal, the conditions which led to the removal of the children continue to exist, and termination of parental rights would best serve the needs and welfare of the children.

5. Petitioner established by clear and convincing evidence that the termination of Mother's parental rights to K.N. and X.H. best meets the needs and welfare of the children and best provides for their development, physical and emotional needs.

6. Petitioner established by clear and convincing evidence that the termination of Mother's parental rights to K.N. and X.H. is appropriate in this case.

DISCUSSION

The grounds for involuntary termination are set forth in 23 Pa. C.S.A. §2511. Petitioner must establish at least one ground for termination. LCOCYS petitioned to terminate Mother's parental rights on the grounds of 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8), and §2511(b).

The statute provides, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

14

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parents. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein, which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. §2511.

This Court must decide whether LCOCYS satisfied its burden of showing that termination of parental rights is appropriate in this case based on Pennsylvania law. Our inquiry in a

termination of parental rights case is a two-step inquiry. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006). First, the Court assesses the parent's conduct. *Id.* Petitioner has the burden of demonstrating by clear and convincing evidence that a statutory ground for termination exists. *Santosky v. Kramer*, 455 U.S. 756 (1982). After the Court has determined a statutory ground for termination has been established, the Court's second inquiry is on the child's needs and welfare. *In re Adoption of R.J.S.*, *supra*.

The Court must examine the circumstances of the case and also consider all explanations offered by the parent to determine if the evidence, in light of the totality of the circumstances, clearly warrants involuntary termination. *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998). Petitioner has the burden of producing evidence that is so clear, direct, weighty and convincing as to enable the Court to come to a clear conviction of the precise facts at issue without hesitation of the truth. *In re Child M.*, 681 A.2d 793 (Pa. Super. 1996).

All children are entitled to certain irreducible minimum requirements from their parents, including adequate housing, clothing, food, love and supervision. *In re J.W.*, 578 A.2d 952 (Pa. Super. 1990).

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted). The Court must also examine the parent's post-abandonment contact with the child, which, to be legally significant,

> must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his [or her] parental responsibilities bears the burden of proof on this question.

16

*In re Z.P.,* 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted).

For the reasons discussed below, and giving primary consideration to the developmental, physical and emotional needs and welfare of the minors, we find that Petitioner clearly and convincingly established statutory grounds for the termination of Mother's parental rights to K.N. and X.H. and that the involuntary termination of Mother's parental rights will best serve the needs and welfare of the minors.

The relevant petitions to terminate Mother's rights were filed on September 24, 2014. K.N. and X.H. were adjudicated dependent and placed in foster care more than 30 months ago on January 8, 2013. In fact, the children had already left Mother's care five months prior due to her attempt to privately place the boys with her relative. While she was caring for the boys, she did not provide for their basic needs. They were malnourished and underweight when they came into the agency's care. Their mental health needs were not being addressed. When they were adjudicated, Mother stipulated to her inability to provide basic sustenance for them.

Mother has not resolved the issues that led to the adjudication of the boys despite a multitude of services provided over the past 30 months that were designed to help her reunify with the children. For more than 30 months, the children have formally been in the foster care system. During that time, Mother has failed to perform parental duties for them and has failed to provide for their basic needs. Mother did not provide for their everyday needs such as housing, clothing, food, or supervision. She did not take them to the doctor, to therapy, or even make herself available on a consistent basis to consent to their mental health treatment. She did not cooperate with the agency to provide for their educational needs, their medical needs, or their mental health needs. Mother did not visit either of the children consistently or participate to any notable degree in their

17

mental health care. To the extent that the boys' needs have been met at all, they have been met by hospitals, residential treatment facilities, and therapeutic foster parents.

During the many months the boys have been in care, Mother did not comply with the permanency plan or with two separate safety plans in which she agreed to prohibit contact between her eldest son, T█████, and her other children. Mother's repeated and continued refusal to comply with court-ordered services, and her neglect of K.N. and X.H., has caused these children to be without essential parental care, control or subsistence necessary for their physical or mental well-being.

Mother has maintained her housing. Other than that, Mother has not provided any evidence that would tend to indicate she is capable of complying with the court-ordered services so as to reunify with K.N. and X.H. It is clear that she cannot provide the constant supervision that is currently therapeutically recommended for both boys. Accordingly, pursuant to 23 Pa. C.S.A. §2511(a)(1) and (2), we find that Petitioner established by clear and convincing evidence the statutory grounds for termination due to Mother's failure to perform parental duties for a period of at least six months immediately preceding the filing of the petition. She caused the children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. Despite the provision of many services intended to effect reunification, Mother has not demonstrated she will remedy her incapacity within a reasonable period of time.

Petitioner has also clearly and convincingly demonstrated that the grounds for termination as set forth in 23 Pa. C.S.A. §2511(a)(5) and (8) have been satisfied. These children were placed into foster care in December of 2012. The conditions which led to the children's placement continue to exist. These conditions were Mother's failure to provide for the children's needs. As

discussed above, Mother is unable to resolve these issues within a reasonable period of time, despite the host of services provided to Mother by LCOCYS over a lengthy period of time.

"[A] parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, health, safe environment." *In re B., N.M.,* 856 A.2d 847, 856 (Pa. Super. 2004). Based on Mother demonstrated inability to follow through with what is required of her within a reasonable period of time, this Court is convinced that termination will best serve the needs and welfare of the children so they have an opportunity to be adopted into permanent, stable, healthy homes that will safeguard and protect them.

Finding that LCOCYS has established statutory grounds for termination Mother's parental rights under 23 Pa. C.S.A. §2511(a), we turn now to our primary consideration: the consideration of the needs and welfare of the children. Under the circumstances presented here, we find it is in the best interest of both children to terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(b).

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.-S.,* 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.,* 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa. Super. 2003).

*In re N.A.M.,* 33 A.3d 95, 103 (Pa. Super. 2011).

19

K.N. and X.H. have spent nearly three years in the care of the agency. Mother has not visited either child for over a year or even spoken with them. Mother has not been attending to X.H.'s or K.N.'s medical, educational, or mental health needs.

When Mother was still visiting K.N., he seemed relieved when Mother's visits were cancelled. His mental health did not improve until Mother stopped visiting altogether. X.H. struggled with visits to Mother's house in the past and has not had any contact with his mother for a significant period of time. We find that termination of the parental bond, to the extent one exists at all, would not destroy "an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Ps. Super. 2003).

Both of these children are severely impaired by their mental health issues. Currently each of the boys needs supervision for 24 hours a day, seven days a week. Mother clearly is not able to provide this level of supervision, especially in light of the fact that she twice chose not to honor safety plans designed to keep her son T███████ away from her other children. More than the average child, K.N. and X.H. require safety, stability, and predictability. Each of these troubled young children needs stability now. Mother has been unable to provide this for nearly three years. Each of the children needs the opportunity to develop a caring bond with adults who will provide consistent, loving care. It is clear that K.H. and X.N. need permanence in a safe, stable home so each of the boys can move forward with his life and begin to deal with and overcome his past abuse, neglect, trauma, and loss. Provided they receive appropriate supervision, care, and treatment, these children can be successful in the future.

To the extent either child has a current bond to his Mother, that bond hinders the child's ability to be adopted into a caring, permanent family. Mother is obviously unable to provide the stability, care, and supervision the children need, as she has demonstrated for over 30 months now.

20

The opportunity for permanence in a stable, loving, and nurturing home will best serve the developmental, physical and emotional needs and welfare of each of these children. Increasing the potential for the children to be adopted into a safe, stable, and permanent home outweighs the possibility that either K.N. or X.H. may suffer detrimental effects from the termination of Mother's rights. *See In re T.S.M., a Minor*, 71 A.3d 251 (Pa. 2013). Moreover, removing the uncertainty of Mother's inconsistent care from their lives is necessary for their well-being. Therefore, we find it is in the best interest of K.N. and X.H. for Mother's parental rights to be terminated to each of the children.

For all of the foregoing reasons, the petitions of LCOCYS to involuntarily terminate Mother's parental rights to K.N. and X.H. are granted.

DATE: November 6, 2015          BY THE COURT:

DOUGLAS G. REICHLEY, J.

21